## IN THE CIRCUIT COURT OF INDEPENDENCE COUNTY, ARKANSAS
## CIVIL DIVISION

**PREFERRED FAMILY HEALTHCARE, INCORPORATED,**
**f/k/a ALTERNATIVE OPPORTUNITIES, INC.,**
**f/k/a HEALTH RESOURCES OF ARKANSAS, INC.**                    **PLAINTIFF**

vs.                        Case No. CV-2018-213-1

**JEREMY Y. HUTCHINSON AND**
**STEEL, WRIGHT, GRAY & HUTCHINSON, PLLC**          **DEFENDANTS**

## COMPLAINT

Comes now the Plaintiff, Preferred Family Healthcare, Incorporated, f/k/a Alternative Opportunities, Inc., f/k/a Health Resources of Arkansas, Inc., by and through its undersigned counsel, and for its Complaint against the Defendants, states as follows:

1.      Health Resources of Arkansas, Inc. ("HRA"), was an Arkansas nonprofit corporation, which on or about May 1, 2014, merged into Alternative Opportunities, Inc. ("AO").

2.      AO was a Missouri nonprofit corporation, which on or about April 23, 2015, merged into Preferred Family Healthcare, Incorporated ("PFH").

3.      PFH is a Missouri nonprofit corporation, registered and authorized to do business in the State of Arkansas.

4.      Separate Defendant, Jeremy Y. Hutchinson, is a lawyer licensed to practice in the State of Arkansas and an individual resident of the State of Arkansas. During all relevant times, Hutchinson also was a member of the Arkansas State Senate.



EXHIBIT
1

F201810637
FILED FOR RECORD
CASE# CV-2018-213-1 ~ 06-15-2018 12:48:09 PM
INDEPENDENCE CO, AR CIRCUIT CLERK
DEBORAH FINLEY
BY: MARCIA YOUNG

5.      Separate Defendant, Steel, Wright, Gray & Hutchinson, PLLC ("SWGH"), is a law firm and an Arkansas professional limited liability company with its principal place of business in Little Rock, Pulaski County, Arkansas.  SWGH can be served through its registered agent, Nate Steel, at 400 West Capitol Avenue, Suite 2910, Little Rock, Arkansas 72201.

6.      SWGH, formerly known as Steel, Wright & Collier, PLLC, changed its name to Steel, Wright, Gray & Hutchinson, PLLC, on August 31, 2016.

7.      This Court has jurisdiction of the subject matter of this action.

8.      This Court has jurisdiction over the parties to this action.

9.      Venue of this action is proper in Independence County, Arkansas, as a substantial part of the events and omissions giving rise to this cause of action occurred in Independence County, Arkansas.

10.     This action is properly filed within the applicable statute of limitations.

11.     On May 21, 2014, David Coleman, a former employee of HRA, filed suit against HRA, in the case of *David Coleman v. Health and Human Resources of Arkansas*, in the Circuit Court of Independence County, Arkansas, Case No. CV-2014-109-4 ("*Coleman*").

12.     HRA was served with Summons and Complaint on June 2, 2014, and on June 9, 2014, Mr. Hutchinson, who was then practicing as the Hutchinson Law Firm PLLC, entered his appearance as counsel for HRA by filing a timely Answer to the *Coleman* Complaint.

13.     On June 28, 2016, counsel for Mr. Coleman propounded Requests for Admissions to HRA by mailing the same to Mr. Hutchinson at both the Hutchinson Law Firm address and the address for SWGH.

2

14.     On July 5, 2016, Mr. Hutchinson confirmed the legal representation of HRA by sending an engagement letter to Bontiea Goss, the chief operating officer of PFH at that time. The letter confirmed that Mr. Hutchinson and Steel, Wright & Collier, PLLC, would represent PFH in "all litigation in Arkansas," which included the *Coleman* case. Ms. Goss acknowledged and executed the engagement letter on the same day. A copy of the signed engagement letter is attached as Exhibit "A" to this Complaint.

15.     Mr. Hutchinson and SWGH failed to advise HRA and/or PFH of the Requests for Admissions. Mr. Hutchinson and SWGH failed to respond to the Requests for Admissions. On August 17, 2016, counsel for Mr. Coleman filed a Motion for Admissions to be Deemed Admitted for Failure to Respond. The Motion for Admissions to be Deemed Admitted for Failure to Respond was served upon Mr. Hutchinson both at the Hutchinson Law Firm address and the address for SWGH. Neither Mr. Hutchinson nor SWGH notified HRA or PFH personnel of the Motion for Admissions to be Deemed Admitted for Failure to Respond.

16.     Mr. Hutchinson and SWGH failed to respond to the Motion for Admissions to be Deemed Admitted for Failure to Respond. On August 31, 2016, the circuit court entered an Order for Admissions to be Deemed Admitted for Failure to Respond. Mr. Hutchinson and SWGH failed to notify HRA or PFH of this fact.

17.     On September 12, 2016, counsel for Mr. Coleman filed a Motion for Summary Judgment, based upon the admissions obtained through the abject failure of Mr. Hutchinson and SWGH to represent HRA. As before, the Motion for Summary Judgment was served upon Mr. Hutchinson both at the Hutchinson Law Firm address and the address for SWGH. Mr. Hutchinson and SWGH failed to notify HRA or PFH of this filing. Notably, Mr. Hutchinson was in contact

3

with client representatives during the relevant time period, yet he persistently concealed the adverse rulings and activities that were developing in the Coleman litigation as a result of the inaction by Mr. Hutchinson and SWGH.

18.    Mr. Hutchinson and SWGH failed to respond to the Motion for Summary Judgment. Mr. Hutchinson and SWGH failed to inform HRA or PFH that counsel did not respond to the Motion for Summary Judgment.

19.    On October 30, 2016, Mr. Hutchinson sent to counsel for Coleman signed responses to the Requests for Admission, denying those requests that would have admitted any liability of HRA to the claims of Coleman. However, Mr. Hutchinson failed to file the Responses, as required by the Arkansas Rules of Civil Procedure. Having signed those responses to the Requests for Admission, Mr. Hutchinson, individually and on behalf of Steel, Wright, Gray & Hutchinson, PLLC, is deemed to have given his oath that his responses were correct, and HRA had no liability for the claims of Coleman.

20.    On December 19, 2016, the circuit court held a hearing on Mr. Coleman's Motion for Summary Judgment. Mr. Hutchinson and SWGH did not appear at the hearing, despite receiving notice of the hearing. Notably, in the circuit court's findings of fact (attached hereto as Exhibit "B"), the court specifically found that Mr. Hutchinson had expressly agreed to that particular hearing date. Mr. Hutchinson and SWGH failed to notify HRA or PFH of the hearing, and of their failure to appear at the hearing. At the conclusion of the hearing, the circuit court signed a Final Order, which was entered that day, awarding judgment in favor of Mr. Coleman and against HRA for the sum of $358,956.87, together with post-judgment interest at the rate of 12% per annum. Mr. Hutchinson and SWGH failed to request reconsideration of the decision to grant

judgment. Mr. Hutchinson and SWGH failed to otherwise appeal the decision of the court – which was entirely premised on the persistent failures and omissions of Mr. Hutchinson and SWGH.

21.     Mr. Hutchinson and SWGH failed to notify HRA and PFH of the judgment, and PFH did not learn of the same until Writs of Garnishment were issued on February 21, 2017 and served upon local banks, well after HRA/PFH's appeal time had expired with no action. HRA and PFH learned of the judgment for the first time from its banking institutions, who were processing the garnishments.

22.     On February 23, 2017, PFH was compelled to pay $383,805.34 in order to satisfy the judgment imposed on HRA/PFH due to the persistent failures of Mr. Hutchinson and SWGH.

23.     During the representation of HRA/PFH in the *Coleman* case, Mr. Hutchinson and SWGH had a duty to possess and use with reasonable diligence the skill ordinarily used by attorneys acting in the same or similar circumstances. The failure of Mr. Hutchinson and SWGH to meet this standard is negligence.

24.     Mr. Hutchinson's and SWGH's negligent acts and omissions include, but are not limited to, the following:

(a)     failing to communicate the existence of Requests for Admissions and failing to timely respond to such Requests for Admission propounded on June 28, 2016;

(b)     failing to communicate the existence of a Motion for Admissions to be Deemed Admitted for Failure to Respond, which was filed on August 31, 2016, and failing to respond to such motion;

(c)     failing to communicate the existence of a Motion for Summary Judgment filed on September 12, 2016, and failing to respond to such motion;

5

(d)     failing to communicate the scheduling of a hearing on the Motion for Summary Judgment, and failing to appear at the hearing on the Motion for Summary Judgment, held on December 19, 2016; and

(e)     failing to notify PFH of the judgment entered against it as a result of counsel's wholesale failure to represent the interests of HRA/PFH.

25.     But for the acts and negligence of Mr. Hutchinson and SWGH, PFH would have prevailed in the *Coleman* case.

26.     As a direct and proximate result of Mr. Hutchinson's and SWGH's acts and negligence, PFH suffered damages of $383,805.34.

27.     Mr. Hutchinson's and SWGH's conduct during the course of representing HRA/PFH exhibited a conscious indifference to the consequences of such inaction and action, from which malice may be inferred, and as such, HRA/PFH is entitled to punitive damages, in addition to the compensatory damages previously stated.

28.     At all times on and after July 5, 2016, Mr. Hutchinson was a member of SWGH and was acting as an agent of SWGH. Therefore, SWGH is liable for all damages caused by Mr. Hutchinson's negligence and acts, as set forth herein.

29.     PFH specifically reserves the right to amend and plead further allegations and causes of action in this case. The specific allegations set forth above do not and shall not constitute a complete list of the negligent acts committed by Mr. Hutchinson and SWGH. Mr. Hutchinson may have caused additional and material financial injury to PFH/HRA through additional acts and omissions, as suggested by his invoicing and receiving monthly payments of $108,000 in 2016 and $271,000 in 2013-2015, without corresponding evidence of any legal work. A recent Plea

Agreement, filed in the United States District Court for the Western District of Missouri, *United States v. Rusty Cranford*, 18-03020-01-CR-S-BCW (Attached hereto as Exhibit "C"), in which Mr. Hutchinson is referred to as Arkansas Senator A, further calls into question Mr. Hutchinson's cause of financial damage to PFH.

30.    PFH respectfully demands a jury of 12 persons to try this case.


WHEREFORE, Plaintiff respectfully prays that it have and recover judgment from and against the Defendants in the amount of $383,805.34, together with prejudgment interest from February 23, 2017, at the maximum rate allowable by law, and for punitive damages, in an amount to be determined by a jury, and for all other relief to which it may be entitled.


Respectfully submitted,
Preferred Family Healthcare, Incorporated

By: _____
A.F. "Tom" Thompson, III, ABA #77133
Kenneth P. "Casey" Castleberry, ABA #2003109
MURPHY, THOMPSON, ARNOLD,
  SKINNER & CASTLEBERRY
555 East Main Street, Suite 200
Post Office Box 2595
Batesville, Arkansas 72503
(870) 793-3821 – telephone
(870) 793-3815 – facsimile
aftomt2001@yahoo.com
caseycastleberry2003@yahoo.com

Of counsel:

Jeffrey D. Morris
BERKOWITZ OLIVER LLP
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri 64108
(816) 561-7007 – telephone

(816) 561-1888 – facsimile
jmorris@berkowitzoliver.com

(Of counsel will file motion for admission *pro hac vice*.)



# STEEL | WRIGHT | COLLIER

## L A W Y E R S   P L L C

NATE STEEL
MARSHALL WRIGHT
WINSTON COLLIER
JEREMY HUTCHINSON
ALEX T. GRAY

400 WEST CAPITOL AVENUE, SUITE 2910
LITTLE ROCK, ARKANSAS 72201
TELEPHONE 501-251-1587
FAX 501-244-2614

OF COUNSEL
GEORGE STEEL, JR.

July 5, 2016

*VIA E-MAIL*

Bontiea Goss
Alternatives Opportunities/ Preferred Health
1111 Glenstone
Springfield, MO 65804
Email: bgoss@aoinc.org

    Re:    Engagement Letter

Dear Ms. Goss:

    Per your request, I searched for the original contract between my firm, which at the time was Hutchinson Law Firm and Alternatives Opportunities. The Agreement was executed in April of 2013. Unfortunately, due to moving to a new location I was unable to locate the original Agreement. I went to my old law office in Benton and searched through the files that remain there. I also looked for the original hard drive that the Agreement was written on and saved  to. Unfortunately, the new tenants at my law office had no knowledge of where the old computers were. I apologize for this inconvenience. Below you will see a new contract that would have been very similar to the original contract.  The original contract executed in April of 2013 was for a retainer for seven thousand five hundred dollars ($7,500.00) per month for work that is described below. After the extensive work done on the merger with Preferred Health and the increase work load due to the new larger entity, it was agreed to increase the retainer amount to nine thousand dollars ($9,000.00) per month. I hope this letter accurately reflects the agreement that we signed in April, 2013 and the subsequent attorney/client relationship that I have enjoyed since the execution of the Agreement. Below, you will see an Agreement that commemorates the original Agreement we signed but are unable to locate.


EXHIBIT
A

March 1, 2016
Page 2

Alternatives Opportunities/ Preferred Health ("Client") has requested Jeremy Hutchinson of the law firm of Steel, Wright & Collier, PLLC (the "Firm") to represent the Client in all litigation in Arkansas, all issues before the Arkansas Department of Human Services (DHS), all issues before the Arkansas Office of Inspector General (OIG), draft, review, and edit all school based contracts and other contracts originating in Arkansas and assist employees of the client in legal matters that may effect their ability to perform their job for the client.

It is our policy to write clients a letter at the commencement of the Representation outlining the scope of services we anticipate performing, advising who in the Firm will handle the Representation and the financial basis of the Representation. If this letter correctly reflects your understanding of the nature and extent of the Representation, please so indicate on the acceptance portion of the letter which follows my signature.

I will have primary responsibility of the Representation. I currently anticipate that no one else is also likely to be principally involved, although, of course, we reserve the right to change or add personnel as may be necessary.

Our fees are based on the criteria considered as a guide in determining the reasonableness of a fee as specified in the Model Rules of Professional Conduct as adopted by the Arkansas Supreme Court. These criteria include the time and labor required for the tasks performed; the difficulty, novelty or complexity of the problem presented; the skill required to perform the tasks in a professional manner; the time constraints imposed by the client or the nature of the matter; the amounts involved and the results obtained for the client; and the expertise, reputation and ability of the lawyer or lawyers performing the services. My customary method of determining fees in the absence of special circumstances described in those criteria is to bill clients a monthly retainer fee.

My monthly retainer fee for these matters will be nine thousand dollars ($9,000.00) per month. The time expended and more importantly, the expertise and relationships required to perform the legal services described above is the basis for determining our fees in the Representation.

Our statements are due and payable within fifteen days of receipt. Repeated failure to pay statements may require the Firm to seek to withdraw from the Representation. In such event, you will be notified in advance of the withdrawal.

Likewise, client may terminate firm representation with thirty days notice for any reason or no reason at all. If this event does occur, it will be clients' responsibility to obtain new counsel and have all files transferred to new counsel. Upon receipt of the termination agreement, the Firm will assist new counsel with information, files, and dates of pending deadlines but it will be the responsibility of the client and/or their new counsel to meet said deadlines.

If you have any questions whatsoever concerning any aspect of the Representation, either now or at a later date, please do not hesitate to contact us. Please indicate your acknowledgement and acceptance of the terms of this letter by signing where indicated on the enclosed copy of this

March 1, 2016
Page 3

letter and returning it to me in the postage-paid envelope enclosed for that purpose.  We sincerely
appreciate the opportunity to be of service.

Sincerely,

STEEL, WRIGHT & COLLIER, PLLC

By _____

Jeremy Y. Hutchinson

## ACCEPTANCE

By executing this acceptance, the undersigned agrees to the Representation by Steel,
Wright & Collier, PLLC, upon the terms and conditions outlined above.

Date: _July 5_____, 2016

Bontiea Goss

By: _____

Name: _Bontiea Goss_____

STEEL, WRIGHT & COLLIER, PLLC
400 West Capitol Avenue, Suite 2910
Little Rock, Arkansas 72201
(501) 251-1587

C201007137
FILED FOR RECORD ~ OSID 209897
CASE# CV-2014-109-4 ~~ 12-19-2016 12:17:42 PM
JUDGE: TIM WEAVER
**DEBORAH FINLEY (DM)**
INDEPENDENCE CO, AR CIRCUIT CLERK

## IN THE CIRCUIT COURT OF INDEPENDENCE COUNTY, ARKANSAS
## CIVIL DIVISON

DAVID COLEMAN                                                  **PLAINTIFF**

VS.                                    CV-2014-109

HEALTH AND HUMAN RESOURCES
OF ARKANSAS                                                    **DEFENDANT**

### FINAL ORDER

COMES on this the 19th day of December, 2016, and before the Court the above styled case and cause, the Plaintiff, David Coleman, for his Motion for Summary Judgment, represented by and through his attorney, Fuller Bumpers, and the Defendant, represented by Jeremy Hutchinson, who did not appear at a final hearing of this matter after being properly served, and upon the record herein, and other matters, things, and proof before the Court, the Court doth finds:

1. That the Plaintiff is a resident of Independence County, Arkansas, and resides in Batesville, Arkansas, and has for more than one year.

2. That jurisdiction and venue are proper with this Court.

3. That Defendant's attorney, Jeremy Hutchinson, mutually agreed to a final hearing on this day in regard to the Plaintiff's Motion for Summary Judgment.



EXHIBIT
B

4. That the Plaintiff properly notified the Defendant, by and through its attorney of record, Jeremy Hutchinson, of today's hearing through the US Mails.

5. That Defendant's attorney, Jeremy Hutchinson, did not appear for this final hearing in this matter.

## FINDINGS OF FACT

6. That the Plaintiff filed his Complaint with the Court on May 21, 2014.

7. That this is an action for breach of contract between the Plaintiff and the Defendant.

8. That the Defendant filed their Answer with the Court on June 9, 2014.

9. That the Plaintiff sent Requests for Admissions to the Defendant on June 30, 2016, and the Defendant did not respond.

10. That a Motion for Admissions to Be Deemed Admitted for Failure to Respond was filed on August 17, 2016, and sent to the Defendant; and the Defendant did not respond.

11. That an Order for Admissions to Be Deemed Admitted for Failure to Respond was entered by this Court on August 31, 2016, and sent to the Defendant; and the Defendant did not respond until October 31, 2016, when he answered the Requests for Admissions, but did not file a Motion in regard to the Admissions.

12. That the Order for Admissions to Be Deemed Admitted for Failure to Respond conclusively admitted for failure to respond, the following facts:

   a. That this Court has jurisdiction over the subject matter and the parties hereto.

   b. That the Plaintiff obtained proper service under the Arkansas Rules of Civil Procedure on the Defendant in this case.

c. That there were no defects with regard to the summons that was served on the Defendant.

d. That the Plaintiff served the Defendant with proper service of process and there in no insufficiency of service of process defense in this case as to the Defendant.

e. That the Defendant, HEALTH AND HUMAN RESOURCES OF ARKANSAS, Inc., is the proper Defendant in this action.

f. That any subsequent purchaser of HEALTH AND HUMAN RESOURCES OF ARKANSAS, Inc., is liable for any and all debts or liabilities in this action.

g. That the Plaintiff worked for the Defendant from 1975 until 2002, when he retired.

h. That in 2005, the Defendant sought out the Plaintiff to return to gainful employment with the Defendant.

i. That the parties entered into a contract for the Plaintiff's return to employment with the Defendant.

j. That the Plaintiff and Defendant entered into a contract during the year 2005.

k. That a term of the contract was that the Plaintiff would return to work for the Defendant.

l. That a term of the contract was that in consideration for working for the Defendant, the Defendant would pay to the Plaintiff a salary of $120,000.00 per year.

m. That the Defendant performed the term of the contract by returning to work for the Defendant and working for the Defendant, from 2005 to 2012 for a salary of $120,000.00 per year.

n. That a term of the contract was that upon the subsequent retirement of the Plaintiff, the Defendant would continue to pay the Plaintiff his normal wages for a period of one year—as set out in the Defendant's Personnel Policy; which the Defendant has not performed; that this amount totals $120,000.00.

o. That a term of the contract was that upon the retirement of the Defendant, the Plaintiff had taken out an annuity, valued above $80,000.00, and would pay the annuity to the Plaintiff.

p. That the value of the annuity on August 24, 2012, was $95,434.32.

q. That the Defendant cashed out the annuity, for a value of $83,409.60 on or about August 24, 2012, but has not paid any of the annuity to the Plaintiff in violation of the contract with the Plaintiff.

r. That the Plaintiff performed his portion of the contract in that he returned to work for the Defendant and did so for seven to eight years working as the Defendant's fulltime Chief Operations Officer and CEO.

s. That the Defendant partially performed in that they paid the Plaintiff's salary.

t. That the Plaintiff declared his intent to retire on or about July 26, 2012.

u. That the Plaintiff medically retired on or about July 31, 2012, by agreement of the parties.

v. That prior to his medical retirement the Defendant renewed its intent to complete the contract and pay the annuity and continuation of salary during its board meeting of July 26, 2012.

w. That since the Plaintiff's retirement, the Defendant has not paid the Plaintiff the agreed upon annuity and continuation of salary.

x. That upon the Plaintiff's retirement, the Defendant was required to pay the Plaintiff the agreed upon annuity and continuation of salary as set out in the Plaintiff's complaint.

y. That the Defendant did not do what the parties's contract required.

z. That the Defendant's performance was not excused for any reason.

aa. That the Defendant has breached the parties's contract.

bb. That the Defendant should immediately fulfill and complete the parties's contract.

cc. That the Defendant is entitled to the interest, which his retirement and annuity would have accrued if properly paid to him.

dd. That all interest for all monies owed should accrue at a rate of 12% annually.

13. That on the 12th day of September, 2016, the Plaintiff filed a Motion for Summary Judgment against the Defendant and sent copy to Defendant's counsel.

14. That more than thirty days has passed since the filing and mailing to the Defendant of Plaintiff's Motion.

15. That the time for filing an Answer to Plaintiff's Motion for Summary Judgment has passed.

16. That as of the hearing in this matter, December 19, 2016, the Defendant has not

a. filed an answer to the Plaintiff's Motion for Summary Judgment, and /or

b. filed affidavits in support of his client's position, which counter the Plaintiff's position.

## CONCLUSIONS OF LAW

17. That the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party, the Plaintiff, is entitled to a complete judgment in this matter against the Defendant as a matter of law.

18. That it is clear that there are no genuine issues of material fact to be litigated and the moving party, the Plaintiff, is entitled to judgment as a matter of law.

19. That once a moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact.

20. That the Defendant did not meet proof with proof, in that the Defendant failed to file an Answer to the Plaintiff's Motion for Summary Judgment within the appropriate timeframe as required by the Arkansas Rules of Civil Procedure.

21. That because of this, this Court finds the above-listed facts to be true and correct:

    a.  That a contract existed between the parties.

    b.  That proper consideration existed for the contract on both sides, and both parties mutually consented to the contract.

    c.  That there was an offer and acceptance, and both parties were capable of entering into the contract.

    d.  That there was detrimental reliance on the contract by the Plaintiff.

    e.  That the Defendant has breached the parties's contract.

    f.  That the Plaintiff is entitled to damages based on the Defendant's breach of their contract.

22. That the Defendant is granted judgment against the Plaintiff in the amount of $120,000.00 plus 12% interest per annum from his date of retirement, July 26, 2012 until August 24, 2016, for a total judgment of $188,822.32.

23. That the Defendant is granted judgment in the amount of the annuity at its value after being liquidated by the Defendant of $83,409.60 plus 12% interest per annum from his date of retirement, July 26, 2012 until August 24, 2016, for a total judgment of $134,894.55.

24. That the Plaintiff is entitled to a total judgment against the Defendant in the amount of $323,716.87, which represents the amounts listed in the Plaintiff's Complaint and interest from the Plaintiff's date of retirement until August 24, 2016.

25. That the Defendant shall continue paying the above-mentioned judgment at 12% per annum until the entire sum has been paid in full to the Plaintiff and interest shall accrue each year based on the above-mentioned dates. That the yearly interest on the above judgment shall begin and be calculated on August 24, 2016 and every August 24th thereafter.

26. **Attorney's Fees and Costs** – that the Defendant shall pay the Plaintiff a reasonable attorney's fee in the amount of $35,000.00 plus his costs in this action in the amount of $240.00, for a total judgment against the Defendant of $35,240.00.

27. That the Defendant shall continue paying the above-mentioned attorney's fees and costs at 12% per annum until the entire sum has been paid in full to the Plaintiff.

28. That the Plaintiff is granted a total judgment against the Defendant for $358,956.87, three hundred-fifty eight thousand-nine hundred fifty six dollars and eighty-seven cents, which includes attorney's fees, costs, and

the above mentioned damages, which shall accrue at 12% per annum until the entire sum has been paid in full to the Plaintiff.

**IT IS SO ORDERED**, that the Plaintiff, David Coleman, shall have judgment against the Defendant, Health Resources of Arkansas, Inc., for the sum of $358,956.87, plus costs; that this judgment shall bear interest at a rate of 12% per annum until paid in full; and for all of which execution, garnishment, lien, etc. may issue on all above mentioned monies.

_____
CIRCUIT JUDGE

Dated this _____ day of _____, 2016.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | Case No. 18-03020-01-CR-S-BCW |
| **MILTON RUSSELL CRANFORD,** | |
| Defendant. | |

## <u>PLEA AGREEMENT</u>

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties

described below have entered into the following plea agreement:

1.     <u>**The Parties.**</u>  The parties to this agreement are the United States Attorney's Office

for the Western District of Missouri, represented by United States Attorney Timothy A. Garrison

and Assistant United States Attorney Steven M. Mohlhenrich, and the Public Integrity Section of

the U.S. Department of Justice, Criminal Division, represented by Acting Chief AnnaLou Tirol and

Trial Attorneys Marco A. Palmieri and Sean F. Mulryne (otherwise referred to as "the Government"

or "the United States"), and the defendant, Milton Russell Cranford ("the defendant"), represented

by Nathan F. Garrett, Esq. and Kathleen A. Fisher, Esq.  The defendant understands and agrees that

this plea agreement does not bind any other federal, state or local prosecution authority or any other

government agency, unless otherwise specified in this agreement or any addendum thereto.

2.     <u>**Defendant's Guilty Plea.**</u>  The defendant agrees to and hereby does plead guilty to

the single-count Information, charging him with a violation of **18 U.S.C. § 666(a)(2)**, that is,

**Federal Program Bribery**.  The defendant also agrees to forfeit to the United States the property

described in the **Forfeiture Allegation** of the Information.  By entering into this plea agreement,



the defendant admits that he knowingly committed these offenses, and is, in fact, guilty of these offenses.

3.    **Factual Basis for Guilty Plea.**    The parties agree that the facts constituting the offenses to which the defendant is pleading guilty are as follows:

### A.    The Defendant and Arkansas Legislature

The defendant, MILTON RUSSELL CRANFORD, also known as Rusty Cranford ("CRANFORD"), a resident of Rogers, Arkansas, is a lobbyist registered with the Arkansas Secretary of State. CRANFORD was an employee of the Charity known as Preferred Family Healthcare, Inc., after April 30, 2015, and Alternative Opportunities, Inc., prior to May 1, 2015 (collectively, the "Charity"), serving as its executive overseeing company operations in the state of Arkansas. CRANFORD operated three lobbying firms: The Cranford Coalition, The Capitol Hill Coalition, and Outcomes of Arkansas. ("CRANFORD Lobbying Firms."). In 2013 and 2014, the CRANFORD Lobbying Firms represented and were paid by a number of clients, including but not limited to the Charity, to advance their interests in the legislature ("CRANFORD Clients").

The Arkansas House of Representatives ("House") and Arkansas Senate ("Senate") were political subdivisions within the State of Arkansas. In fiscal years 2010-2017, the State of Arkansas received more than $10,000 per year in funds from the United States Government in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance. The General Improvement Fund ("GIF") was a fund established by the Arkansas General Assembly consisting of what was commonly referred to as "surplus" state revenues, which consisted of special revenues from various sources as specified by the General Assembly.

### B.    Defendant and Others Bribed Public Officials for Legislative Action

Beginning at least as early as 2010 and continuing to in or about 2017, CRANFORD, together with Person #1, Person #2, Person #3, other Charity executives, and others known and unknown to the United States, paid bribes in the form of money and other things of value to Arkansas State Senator Jonathan Woods ("Woods"), Arkansas State legislator Henry Wilkins IV ("Wilkins"), Arkansas Senator A, and others, to provide favorable legislative action for CRANFORD and the Charity, including, but not limited to, steering Arkansas GIF grant money to the Charity; holding up agency budgets; initiating legislative audits; and sponsoring, filing and voting for legislative bills. CRANFORD transmitted money and other things of value by different manners and means, including, but not limited to: providing cash to Woods, facilitating employment to individuals close to Woods, providing cash and checks to a church where Wilkins was a pastor, and providing cash and job referrals to Arkansas Senator A.

By paying bribes to Woods, Wilkins, Arkansas Senator A, and others known and unknown to the United States, CRANFORD, Person #1, Person #2, Person #3, other members of the

2

Resource Team and others known and unknown to the United States, enriched themselves, the Charity, CRANFORD Clients, and others by: (1) having Woods, Wilkins, Arkansas Senator A, and others provide favorable legislative action for CRANFORD, the Charity, CRANFORD Clients, and others known and unknown to the United States; (2) maintaining political influence in the Arkansas legislature and with Arkansas State agencies to the benefit of CRANFORD, the Charity, CRANFORD Clients, and others known and unknown to the United States; and (3) sending additional income, in the form of GIF grants, to the Charity that CRANFORD, Person #1, Person #2, Person #3, other members of the Resource Team and others known and unknown to the United States, then embezzled, stole, obtained by fraud, and without authority knowingly converted to their own use property worth at least $5,000 that was under the care, custody, and control of the Charity.

*CRANFORD Offered and Gave Money and Other Things of Value to*
*Woods, Wilkins and Arkansas Senator A in Exchange for Favorable Legislative Action*

Between the dates alleged in the Information, CRANFORD provided more than five thousand dollars ($5,000) in cash to Woods, and assisted Woods in obtaining employment of Person #14 by the Charity, in exchange for Woods sponsoring and voting to approve legislation that provided GIF monies to DHS-DBHS and influencing a $1,000,000 grant of GIF money to the Charity and a $400,000 grant to Entity G. "Entity G" was a non-profit corporation, with an address in the Western District of Arkansas, which purportedly sought to create manufacturing jobs in northwest Arkansas.

Between the dates alleged in the Information, CRANFORD paid Wilkins in cash and directed approximately $88,000 in checks to Wilkins in the form of checks from CRANFORD Lobbying Firms, CRANFORD Clients, and the Charity, including one $30,000 check from the Charity, that were deposited into the St. James United Methodist Church ("SJUMC") Discretionary account controlled by Wilkins, who was a pastor at SJUMC. In exchange, Wilkins agreed to perform, and did perform, legislative acts that were favorable to CRANFORD, the Charity, CRANFORD Clients, and others, including, but not limited to, steering $122,564.93 to the Charity and another $61,218.06 to another Cranford Client, Entity F, from GIF funds available to Wilkins from Act 818 of 2013. CRANFORD varied the check amounts, and continued to make payments to SJUMC after Wilkins left the legislature, to conceal the scheme.

Between the dates alleged in the Information, CRANFORD also, directly and indirectly, gave Arkansas Senator A cash; checks; wire transfers; tickets to sporting events, including luxury box seats and tickets to the 2013 World Series; retainers; attorney's fees; and referrals to provide services to CRANFORD, the Charity, CRANFORD Lobbying Firms, CRANFORD Clients, and others. In or about April 2013, CRANFORD facilitated the hiring of Arkansas Senator A by the Charity. Arkansas Senator A was paid $7,500 a month, which increased to $9,000 a month in or about May 2014, until in or about 2017. From in or about 2012, to in or about 2017, Arkansas Senator A received over $500,000 in cash; checks; wire transfers; retainers; and attorney's fees generated from CRANFORD, the Charity, CRANFORD Lobbying Firms, and CRANFORD Clients who CRANFORD referred to Arkansas Senator A. In exchange, Arkansas Senator A

3

performed legislative acts that were favorable to CRANFORD, the Charity, CRANFORD Clients, and others, including, but not limited to, holding up agency budgets; initiating legislative audits; sponsoring, filing and voting for legislative bills, and influencing the award of GIF funds to the Charity and CRANFORD clients.

*Woods, Wilkins, and Arkansas Senator A Performed Favorable Legislative Acts*

In exchange for the money and other things of value described above that were offered and given by CRANFORD, Woods, Wilkins, Arkansas Senator A, and others known and unknown to the United States performed multiple legislative acts that were favorable to CRANFORD, the Charity, CRANFORD Lobbying Firms, and CRANFORD Clients, including, but not limited to, the following examples.

Beginning in 2012 and then continuing through 2013, behavioral health service providers were rated by state regulators on their ability to adhere to certain regulations. Many behavioral health providers across the state of Arkansas, including the Charity, wanted to end this "rating system." Arkansas Senator A and Wilkins advanced the goal of ending this rating system by performing legislative acts. In 2012, and at CRANFORD's request, Arkansas Senator A used his position on a legislative audit committee to initiate an audit of the company that administered the rating system ("Rating Company"). On or about March 11, 2013, Wilkins filed HB 2209, a "shell bill" designed to be backfilled with content should it need to be moved forward in the legislative session and if later passed, would have been detrimental to the interests of the Rating Company. HB 2209 passed the Arkansas House of Representatives on or about April 4, 2013, with Wilkins voting in favor. During the legislative session, CRANFORD arranged a meeting between representatives of the Rating Company and CRANFORD, Arkansas Senator A and Wilkins. CRANFORD told the Rating Company that they needed to work with CRANFORD because Wilkins sat on the House Budget Committee and that a refusal to work with CRANFORD regarding their complaints might affect their ability to renew their contract as Wilkins would be involved. Later, an agreement was reached regarding the implementation of the rating system that was favorable to CRANFORD, the Charity, and other CRANFORD Clients. HB 2209 died in the Arkansas Senate Committee on Public Health, Welfare and Labor.

Also, in 2013, and at CRANFORD's request, Woods sponsored, and then Woods, Wilkins, and Arkansas Senator A later voted in favor of, legislation that became Acts 791 and 818, which appropriated Arkansas funds for GIF spending. Woods, Wilkins and Arkansas Senator A then took additional official action, including writing letters of support and influencing government officials, to steer the Act 791 and Act 818 GIF funds to the Charity and Entity F - an Arkansas non-profit corporation and CRANFORD Client.

In 2015, at CRANFORD's request, Arkansas Senator A steered GIF funds to another CRANFORD Client, Entity H. Specifically, between January 20, 2015 and March 2, 2015, Arkansas Senator A filed two bills, Senate Bill 62 ("SB 62") and Senate Bill 655 ("SB 655"), which sought to appropriate up to $3,000,000 in state GIF funds to Entity H. On March 16, 2015,

4

Arkansas Senator A voted in favor of SB 62, which later became Act 610 with an effective date of July 1, 2015. Cranford's lobbying contract with Entity H was subsequently renewed.

Also in 2015, Arkansas Senator A advanced legislation which sought to change the definition of the term "independent contractor" for purposes of overtime and other workplace benefits, to the benefit of the Charity and other CRANFORD Clients. Specifically, at the direction of Person #9, who worked at the Charity and was a business partner with Arkansas Senator A and CRANFORD, Arkansas Senator A filed Senate Bill 932 ("SB 932"), which was another shell bill. A later bill, House Bill 1540 ("HB1540"), was filed in or about March 2015, and contained specific statutory language that was emailed to Arkansas Senator A on March 4, 2015, by Person #9, for inclusion in the bill. In or about March 2015, Arkansas Senator A voted in favor of HB 1540.

### C.   Defendant's and Others' Theft, Embezzlement, and Misapplication of Funds From the Charity

One of the purposes for which the defendant bribed public officials was to send additional income to the Charity to enable CRANFORD, Person #1, Person #2, Person #3, other members of the Resource Team and others known and unknown to the United States, to embezzle; steal; obtain by fraud; and without authority, knowingly convert to their own use property worth at least $5,000 that was under the care, custody, and control of the Charity. The defendant acknowledges that this underlying embezzlement, theft, and misapplication of Charity funds constitutes "relevant conduct" for sentencing.

In each of the fiscal years 2010 through 2016 (July 1 of the indicated year through June 30 of the following year), the Charity received greater than $10,000 in funds from the Federal government, more particularly, the Departments of Health and Human Services ("HHS"), Labor ("DOL"), Veterans Affairs ("VA"), Housing and Urban Development ("HUD"), Justice ("DOJ"), Agriculture ("USDA"), and Education ("DoED") under programs involving grants, contracts, loans, guarantees, insurance, and other forms of federal assistance.

CRANFORD, Person #1, Person #2, Person #3, Person #5, and others known and unknown to the United States devised and executed multiple schemes to embezzle, steal, and unjustly enrich themselves at the expense of the Charity, including:

- Causing the Charity to misapply its funds for unlawful contributions to the campaigns of elected public officials, jeopardizing the Charity's tax-exempt status in order to increase the Charity's total receipts so they had more funds available from which to embezzle and steal.

- Causing the Charity to spend substantial amounts of funds on lobbying and political advocacy, which violated both the Charity's tax-exempt status and the restrictions imposed by law on organizations receiving Federal funds from grants and contracts.

- In 2011, CRANFORD, acting in his capacity as an employee of the Charity, advocated to Person #1, Person #2, and Person #3 that the Charity enter into a contract with Donald Andrew Jones, and influenced the Charity in its award of the contract whereby the Charity paid Jones for lobbying and advocacy services. After Person #1, on behalf of the Charity, agreed to enter into a contract with Jones, Jones made payments to CRANFORD and Cooper of a portion of the funds Jones obtained from the Charity in exchange for CRANFORD's influence on Jones's behalf. In order to maintain his contract with the Charity, Jones agreed to pay funds to CRANFORD and Cooper, primarily by checks made payable to CRANFORD, Cooper, The Cranford Coalition, and The Capitol Hill Coalition. Between January 12, 2012, and January 17, 2017, Jones did pay funds to CRANFORD and Cooper totaling $264,000.

- At least as early as 2013, Person #1, acting in his capacity as an executive of the Charity, caused the Charity enter into a contract with The Cranford Coalition, whereby the Charity paid The Cranford Coalition for lobbying and advocacy services. In exchange for the Charity's award of this contract to The Cranford Coalition, and as a condition for the Charity's bonus payments to The Cranford Coalition, Person #1 demanded CRANFORD pay him approximately half of the bonus payments The Cranford Coalition obtained from the Charity. Doing business as The Cranford Coalition, from 2013 through 2017, CRANFORD solicited the assistance of elected and appointed officials regarding legislative issues that impacted the Charity, in particular matters involving the Charity, and in steering grants and other sources of funding to the Charity. Person #1 influenced Person #2 and Person #3 to cause the Charity to extend and renew its contract with and make bonus payments to The Cranford Coalition. In order to continue to receive bonus payments from the Charity, CRANFORD agreed to and did pay funds to Person #1, by checks made payable to Person #1 and in cash. In June, 2014, because CRANFORD owed large amounts of income taxes resulting from his inability to deduct the kickbacks paid to Person #1, CRANFORD and Person #1 agreed that CRANFORD would make cash payments to Person #1 of thirty percent (30%) of the funds The Cranford Coalition obtained from the Charity. For the years 2013 through 2017, Person #1 caused the Charity to pay The Cranford Coalition $2,897,889.73, with $2,174,389.73 paid directly and the remainder paid through Entity A and Entity B. During the same period, CRANFORD paid kickbacks to Person #1, by way of checks totaling $613,600 and, on numerous additional occasions, in cash.

- Causing the Charity to pay excessive amounts to and use its resources for their for-profit companies, including Charity payments to The Cranford Coalition pursuant to a "consulting agreement" that exceeded the value of the services provided to the Charity under the contract.

6

- Causing the Charity to make payments for real estate unrelated to the Charity's mission, including the Charity's rental payments to CRANFORD for properties he owned in Florida and Texas.

- Causing the Charity to pay their personal expenses, including by way of their extensive use of corporate credit cards for which the Charity paid the bills.

- Enjoying the use of Charity-provided premium tickets for sporting events for themselves, family members, and their friends.

- Causing the Charity to lend significant funds to themselves and their for-profit companies.

### D.   Defendant's Plea to the Information

During the one-year period beginning January 1, 2013 and ending on or about December 31, 2013, Arkansas received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of federal assistance.

CRANFORD admits and acknowledges that from in or around January 2013 to December 2013, in the Western District of Missouri and elsewhere, he, Person #1, Person #2, Person #3, and others known and unknown to the United States, corruptly gave, offered, and agreed to give a thing of value to any person intending to influence and reward an agent of a local government and an agency thereof, in connection with any business, transaction, or series of transactions of such local government and agency involving something of value of $5,000 or more, namely:

- CRANFORD, and others known and unknown to the United States gave Woods more than five thousand dollars ($5,000) in cash, and agreed to cause and did cause the Charity to employ Person #14, in exchange for Woods taking favorable legislative action on behalf of CRANFORD and the Charity, including steering GIF funds to the Charity and CRANFORD Clients;

- CRANFORD, and others known and unknown to the United States directed cash and checks from the Charity, CRANFORD Lobbying Firms, and CRANFORD Clients to Wilkins through the SJUMC Discretionary, including a $30,000 check from the Charity deposited into the SJUMC Discretionary account on December 18, 2013, in exchange for Wilkins taking favorable legislative action on behalf of CRANFORD, the Charity, CRANFORD Clients, and others known and unknown to the United States, including but not limited, to steering GIF funds to the Charity and CRANFORD Clients; and

- CRANFORD, and others known and unknown to the United States, offered and gave, directly and indirectly, money and other things of value to Arkansas Senator A in the form of checks; wire transfers; tickets to sporting events; retainers;

7

attorney's fees; and referrals to provide services to CRANFORD, the Charity, CRANFORD Lobbying Firms, CRANFORD Clients, and others known and unknown to the United States, in exchange for Arkansas Senator A taking favorable legislative action on behalf of CRANFORD, the Charity, CRANFORD Clients, and others known and unknown to the United States, including but not limited to, holding up agency budgets; initiating legislative audits; sponsoring, filing and voting for legislative bills, and influencing the award of GIF funds to the Charity and CRANFORD clients.

**E.    Defendant's Admission of the Forfeiture Allegation of the Information**

From January 15, 2010, until April 11, 2017, Person #1, Person #2, and Person #3 caused the Charity to disburse funds to The Cranford Coalition, directly and through its related for-profit corporations, into Cranford Coalition's checking accounting at Bancorp South ending in 2316, from the following entities and in the following amounts:

| Calendar Year | The Charity | Entity A | Entity B | Total |
|---|---|---|---|---|
| 2010 | $0 | $81,550.00 | $2,000.00 | $83,550.00 |
| 2011 | $0 | $213,750.00 | $0 | $213,750.00 |
| 2012 | $7,900.00 | $304,500.00 | $0 | $312,400.00 |
| 2013 | $795,615.00 | $663,500.00 | $60,000.00 | $1,519,115.00 |
| 2014 | $337,024.73 | $0 | $0 | $337,024.73 |
| 2015 | $547,750.00 | $0 | $0 | $547,750.00 |
| 2016 | $310,000.00 | $0 | $0 | $310,000.00 |
| 2017 | $184,000.00 | $0 | $0 | $184,000.00 |
| Total | $2,182,289.73 | $1,263,300.00 | $62,000.00 | $ 3,507,589.73 |

Between January 12, 2012, and January 17, 2017, Jones paid CRANFORD a total of $219,000, by way of checks payable to CRANFORD and The Cranford Coalition.

CRANFORD's bribery scheme during 2013, as charged in the Information, yielded financial benefits for the Charity and other CRANFORD Clients (including but not limited to Entity F, Entity H, and Entity I) beginning in 2013 and continuing through the date of the Information. Specifically, from the ACT 791 and 818 GIF appropriations, $1,122,564.93 went to the Charity and $436,970.06 went to Entity F.  Additionally, CRANFORD's bribes on behalf of Entity F assisted in preventing DYS from taking action that could have resulted in Entity F's loss of millions of dollars in contracts with the State of Arkansas, from 2013 through the date of the Information.

In admitting the Forfeiture Allegation of the Information, the defendant acknowledges and agrees a money judgment will be entered against him in the stipulated amount of $3,726,589.73.

8

4. **Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the indictment, as well as all other uncharged, related criminal activity, may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which he is pleading guilty.

5. **Statutory Penalties.** The defendant understands that, upon his plea of guilty to the single-count Information, charging him with violation of **18 U.S.C. § 666(a)(2)**, that is, **Federal Program Bribery**, the maximum penalties the Court may impose are 10 years' imprisonment, 3 years' supervised release, a fine of $250,000 (or twice the amount of the gross gain or gross loss, whichever is greater), an order of restitution, an order of forfeiture, and a $100 mandatory special assessment, which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class C felony.

6. **Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

    a. In determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable."

    b. The Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing.

9

      c.     In addition to a sentence of imprisonment, the Court may impose a term of supervised release of up to three years; the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed.

      d.     If the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to two years without credit for time previously spent on supervised release. In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of the defendant's first supervised release.

      e.     The Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range.

      f.     Any sentence of imprisonment imposed by the Court will not allow for parole.

      g.     The Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office.

      h.     The defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

      i.     On the Forfeiture Allegation of the Information, the defendant and the United States stipulate and agree to recommend that the Court order a money judgment in the amount of $3,726,589.73.

j.     The defendant agrees that the United States may institute civil, judicial or administrative forfeiture proceedings against all forfeitable assets in which the defendant has an interest, and that he will not contest any such forfeiture proceedings.

      k.     The defendant agrees to forfeit all interests he owns or over which he exercises control, directly or indirectly, in any asset that is subject to forfeiture to the United States, either directly or as a substitute for property that was subject to forfeiture but is no longer available for the reasons set forth in 21 U.S.C. § 853(p) (which is applicable to this action pursuant to 28 U.S.C. § 2461(c). **One such asset is the U.S. currency seized at the time of the defendant's arrest, totaling approximately $17,989.00.** With respect to any asset which the defendant has agreed to forfeit, the defendant waives any constitutional and statutory challenges

10

in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the United States Constitution. The forfeited funds will be deposited into the Asset Forfeiture Fund. Forfeiture of the defendant's property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment or any other penalty the Court may impose on the defendant in addition to forfeiture. However, defendant understands that the Monetary Penalties Unit of the United States Attorney's Office for the Western District of Missouri may, in its discretion, submit a restoration request as to the forfeited funds to the Money Laundering and Asset Recovery Section (MLARS), Criminal Division, U.S. Department of Justice, and if granted, these funds would be provided by the Department of Justice to the Clerk of the Court for the payment of restitution in this case. Defendant understands that whether to approve or deny this request, in whole or in part, is entirely within the discretion of the Chief of MLARS.

l.      The defendant agrees to fully and truthfully disclose the existence, nature and location of all assets forfeitable to the United States, either directly or as a substitute asset, in which he, his co-defendants and his co-conspirators have or had any direct or indirect financial interest, or exercise or exercised control, directly or indirectly, during the period from 2010 to the present. The defendant also agrees to fully and completely assist the United States in the recovery and forfeiture of all such forfeitable assets.

m.      The defendant specifically agrees and authorizes any state or local law enforcement agency having possession of property subject to federal forfeiture to release the property to a federal agency, either prior to or after entry of an order forfeiting the defendant's interest in such property. Further, the defendant agrees to hold harmless any state or local law enforcement agency which releases such property to any federal agency for federal forfeiture proceedings.

n.      The defendant agrees to take all necessary steps to comply with the forfeiture matters set forth herein before his sentencing.

7.      **Government's Agreements**. Based upon evidence in its possession at this time, the United States, as part of this plea agreement, agrees not to bring any additional charges against the defendant for any federal criminal offenses related to the crimes charged in the Information for which it has venue and which arose out of the defendant's conduct described above. Additionally,

11

at the time of sentencing, the United States agrees to dismiss the original Indictment returned in this case, in its entirety.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the Person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that, if the United States elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

8.     **Preparation of Presentence Report**. The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the counts to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel, and to

12

correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9.     **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his pleas of guilty only if the Court rejects the plea agreement, or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that, if the Court accepts his pleas of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his pleas of guilty.

10.    **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

      a.     The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable."

      b.     The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal

13

statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay.

   c. The defendant understands and agrees that the factual admissions contained in paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, will be used to calculate the defendant's Guidelines range.

   11. **Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in paragraph 10 and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

   12. **Change in Guidelines Prior to Sentencing.** The defendant agrees that, if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by the defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

   13. **Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

   a. oppose or take issue with any position advanced by the defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

   b. comment on the evidence supporting the charges in the information;

c.    oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed, and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

d.    oppose any post-conviction motions for reduction of sentence, or other relief.

14.    **Waiver of Constitutional Rights.**    The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

a.    the right to plead not guilty and to persist in a plea of not guilty;

b.    the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

c.    the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

d.    the right to confront and cross-examine the witnesses who testify against him;

e.    the right to compel or subpoena witnesses to appear on his behalf; and

f.    the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that, by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that, if he pleads guilty, the Court may ask him questions about the offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands that he has pleaded guilty to felony offenses and, as a result, will lose his right to possess a firearm or

15

ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold

public office, or serve on a jury.

15.    **Waiver of Appellate and Post-Conviction Rights.**

a.    The defendant acknowledges, understands and agrees that, by pleading guilty pursuant to this plea agreement, he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct; and

b.    The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) a sentence imposed in excess of the statutory maximum. However, if the United States exercises its right to appeal the sentence imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

16.    **Waiver of Venue.**   The defendant waives any challenge to venue in the Western

District of Missouri.

17.    **Discovery Waiver.**   The defendant waives the right to any further discovery or

disclosures of information not already provided at the time of the entry of the guilty plea, other than

information required to be disclosed under Federal Rule of Criminal Procedure 32(i)(2) and

exculpatory or impeachment information casting doubt upon sentencing factors.

18.    **Financial Obligations.**   By entering into this plea agreement, the defendant

represents that he understands and agrees to the following financial obligations:

a.    The Court must order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with all other uncharged, related criminal activity.

b.    The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

16

c.      The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control, directly or indirectly, including assets and property held by a spouse, nominee or other third party.  The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

d.      Within ten (10) days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit:  (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office.  The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility.

e.      At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of forfeitable assets and restitution.

f.      The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

g.      The defendant understands that a Special Assessment will be imposed as part of the sentence in this case.  The defendant promises to pay the Special Assessment of **$100** by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case.  The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

h.      The defendant certifies that he has made no transfer of assets or property for the purpose of: (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; or (3) hindering efforts of the USAO to enforce such financial obligations.  Moreover, the defendant promises that he will make no such transfers in the future.

i.      In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under

17

this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

19.     **Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

20.     **Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

21.     **Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his pleas of guilty.

The defendant also understands and agrees that, in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal, or any leads from such

18

statements or testimony, shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

22. **Defendant's Representations**. The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys, or any other party to induce him to enter his pleas of guilty.

23. **No Undisclosed Terms**. The United States and the defendant acknowledge and agree that the above stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

24. **Standard of Interpretation**. The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any

19

drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

TIMOTHY A. GARRISON
United States Attorney, Western District of Missouri

Dated:  __6/7/18__

By: __/s/Steven M. Mohlhenrich__
STEVEN M. MOHLHENRICH
Assistant United States Attorney

ANNALOU TIROL
Acting Chief, Public Integrity Section

Dated:  __6/7/18__

By: __/s/ Marco A. Palmieri__
MARCO A. PALMIERI
SEAN F. MULRYNE
Trial Attorneys

I have consulted with my attorneys and fully understand all of my rights with respect to the offense charged in the information.  Further, I have consulted with my attorneys and fully understand my rights with respect to the provisions of the Sentencing Guidelines.  I have read this plea agreement and carefully reviewed every part of it with my attorneys.  I understand this plea agreement and I voluntarily agree to it.

Dated:  __6/7/18__

__/s/ Milton Russell Cranford__
MILTON RUSSELL CRANFORD
Defendant

We are defendant Milton Russell Cranford's attorneys.  We have fully explained to him his rights with respect to the offense charged in the information.  Further, we have reviewed with him the provisions of the Sentencing Guidelines that might apply in this case.  We have carefully reviewed every part of this plea agreement with him.  To our knowledge, Milton Russell Cranford's decision to enter into this plea agreement is an informed and voluntary one.

Dated:  __6/7/18__

__/s/ Nathan F. Garrett__
NATHAN F. GARRETT
KATHLEEN A. FISHER
Attorneys for Defendant

20